UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------------- x

GEORGE OCKIMEY and PAUL W. FOWLER,     :

                                : <u>MEMORANDUM AND ORDER</u>

            Plaintiffs,     :

                                : 05-CV-3872 (ENV) (MLO)

       -against-     :

                                  :

TOWN OF HEMPSTEAD, HEMPSTEAD     :
DEPARTMENT OF SANITATION, STEVEN PEPE,     :
in his individual and official capacity, SANTO SAIS II,     :
in his individual and official capacity, CHARLES R.     :
SELLITTO, in his individual and official capacity, STANLEY :
LOMBARDO, in his individual and official capacity,     :
ANGELO MAFFEI, in his individual and official capacity,     :
PETE MALITRANO, in his individual and official capacity     :

                       Defendants.     :

--------------------------------------------------------------------- x

VITALIANO, D.J.

On August 11, 2005, plaintiffs George Ockimey and Paul W. Fowler filed a complaint

alleging various violations of federal and New York civil rights laws against defendants Town of

Hempstead ("Hempstead"), Hempstead Department of Sanitation ("DOS") and multiple

Hempstead town employees, both in their individual and official capacities. Plaintiffs also stated

a breach of contract claim against Hempstead. Defendants Charles Sellitto, Santo Sais and

Angelo Maffei have since been dismissed from this action by agreement of the parties. Now,

pursuant to Federal Rule of Civil Procedure 56, defendants Hempstead, DOS, Pepe, Lombardo

and Malitrano move for summary judgment.[1] The motions are granted.

### Background

The following facts are taken from the parties' Local Rule 56.1 Statements, including

attached exhibits, and are construed, as they must be, in the light most favorable to Ockimey and

Fowler, the nonmoving parties. See <u>Capobianco v. City of New York</u>, 422 F.3d 47, 54-55 (2d

---

[1] Defendants Hempstead and DOS have moved collectively for summary judgment. Similarly, defendants Pepe, Lombardo and Malitrano have moved collectively for summary judgment.

Cir. 2005). Factual disputes are noted.

I.    *Plaintiffs' Tenure with Hempstead*

Ockimey, a black male, began working for Hempstead in June 1988, when he was hired as

a "Seasonal Parks and Recreation Field Worker". In May 1989, Ockimey was transferred to

DOS, where he worked as a seasonal laborer. In 1995, he was terminated, allegedly for poor

attendance. (Jacobs Aff. at Ex. I). He challenged his termination by filing two complaints with

the New York State Division of Human Rights ("SDHR"), which were settled in 1996 and

resulted in his reinstatement that same year. (Id.) Ockimey filed another complaint with SDHR

in 1997 concerning allegations that he was being targeted and black-balled by DOS supervisors.

(Id.)[2] On December 22, 1997, DOS hired Ockimey to a full-time civil service position, with the

title "Laborer I". He was assigned to the Field Services unit, where he maintained DOS property

and occasionally performed garbage collection duties.[3] During that period, Field Services

became the Code Enforcement/Field Services unit ("Code Enforcement"). Ockimey continued

on with Code Enforcement, working in that capacity until his termination in 2002.

Fowler, also a black male, began working as a Hempstead town seasonal laborer in June

1995. Some time around July 1999, Fowler was hired to the full-time position of Laborer I by

DOS. During their tenure with DOS, both men were members of a union, the Civil Service

Employees Association, Inc. (the "CSEA").

From 1999 to 2002, Fowler worked in Code Enforcement, alongside Ockimey. The two

worked as part of a Code Enforcement work crew (the "work crew"), that included three other

laborers: Edward Conforti Jr. ("Conforti Jr."), Robert Miller ("Miller") and John Delewin

---

[2] This complaint was eventually dismissed by Administrative Law Judge Robert M. Vespoli on November 22, 2006.
No objection or appeal was filed to challenge ALJ Vespoli's decision.
[3] Ockimey also testified that, at times, he and Fowler would be assigned to the Hempstead Parks Department (the
"Parks Department") when a new park was opened and was tasked with landscaping work.

("Delewin"). The work crew was led by its foreman, defendant Peter Malitrano, and its supervisor, Maffei, both white. As part of Code Enforcement, the work crew was charged with following up on municipal code violations concerning lawn and other property maintenance matters as well as rubbish disposal. These violations would be discovered and reported by Code Enforcement inspectors, who would also cite homeowners for them. Where a homeowner failed to respond to a citation, a work ticket would be generated, specifying the address and what work needed to be performed (lawn care, dumping of debris, etc.). The workers would then take whatever debris was generated by the work or left at the address to the Hempstead landfill. There, the truck's payload would be weighed before dumping and the driver would be given a weight ticket. At the end of each day, the drivers were to attach all the weight tickets they had received to a time sheet documenting their work.

Although largely dependent on the type of work to be completed, each morning the work crew was usually divided into pairs and each pair given a set of work tickets to complete.[4] Depending on the type of work to be done or debris to be collected, the pairs would be assigned a DOS truck ranging from a simple pick-up truck to a larger vehicle, either a "packer" or a dump truck. Ockimey and Fowler both testified without contradiction that they were generally assigned to work together, although both specifically recalled also being paired with various white workers at times. Because Ockimey did not have a valid New York driver's license, Fowler would drive the DOS pick-up truck to the job sites.

## II. Employment Termination

### A. Ockimey and Fowler are Terminated and Request Arbitration

Plaintiffs were terminated on November 8, 2002. That day, Ockimey was summoned to a

---

[4] At times, it appears from the record, a job would be large enough as to require more than two or three employees. In these instances, the work crew would visit a site *en masse.*

meeting at DOS headquarters with DOS supervisors and his union representative, Sais. There, he was given a "Notice of Discipline and Charges", which was dated the same day. Fowler also met with DOS supervisors that day and he received his own "Notice of Discipline and Charges", also of even date.

The notices gave identical reasons for termination too, charging that "[o]n repeated occasions from May 2000 to October 2000, you were observed collecting bags of waste deposited by landscapers" at 1034 Rochelle Court, Uniondale, New York ("1034 Rochelle Court"), which was Ockimey's mother's home address. (Brewington Aff. at Exs. B & C.) The notices went on to assert that Ockimey and Fowler "then transported these waste bags in a [t]own vehicle, during the time period you were required to be performing your job duties, to the Merrick sanitation facility and did dispose of same without paying the required fees." (Id.) The notices also detailed an incident on June 2, 2000, where Ockimey, aided by Fowler, allegedly collected approximately 75 bags of waste from 1034 Rochelle Court and deposited them at the Merrick sanitation facility without paying the necessary fees. Finally, the notices listed a litany of ways in which this alleged conduct violated plaintiffs' duties.

Some time thereafter, though it is unclear when, plaintiffs approached CSEA about challenging their termination through arbitration. The response was mixed: Fowler apparently had little trouble persuading the union to push his cause, but union representatives originally refused to arbitrate on behalf of Ockimey. According to a document written by Ockimey, dated August 7, 2003,[5] a union representative told him that he felt that DOS had sufficient evidence against him to justify the termination. (Ryan Aff. at Ex. I). Ockimey contends that he then insisted that CSEA document its refusal in writing. (Id.) Two months later, CSEA agreed to

---

[5] This document appears to be a letter addressed "[t]o whom it may concern." Lacking also is proof of whether the letter was ever sent to anyone.

arbitrate on his behalf.

Over the course of several months in 2003 and 2004, separate arbitration proceedings were held for Ockimey and Fowler. DOS argued that both had been involved in an "illegal transfer station", in which they improperly dumped grass clippings and yard waste on behalf of a landscaper, without permission and without paying the requisite fees, in exchange for payment. Plaintiffs denied these charges, claiming that they only collected debris generated by the renovation of Ockimey's home and had done so with permission from DOS supervisors. Moreover, they argued that it was common practice for work crews to collect debris from DOS supervisors' homes (as well as the homes of their friends and families) and that they were being unfairly singled out for discipline. On August 23, 2003, Fowler and DOS settled their dispute, with no admission of wrongdoing by either side, and with Fowler's reinstatement to his title as "Laborer I".[6] Nearly a year later, on July 7, 2004, the arbitrator upheld Ockimey's termination, concluding that he had operated an "illegal transfer station" and that DOS was justified in terminating him. (Brewington Aff. at Ex. J).

While the arbitration was pending however, on January 7, 2003, Ockimey filed another complaint with SDHR charging that he was terminated based on racial animus and in retaliation for testimony he gave in a sexual harassment suit against a DOS employee. On February 17, 2003, Fowler also filed suit with SDHR asserting wrongful termination and that he was improperly denied promotion and overtime based on his race. Fowler eventually settled his complaint with defendants, but there is nothing in the record that reflects the disposition of Ockimey's SDHR complaint.

---

[6] Arbitrator Roger Maher entered a corresponding consent judgment on August 23, 2003.

### B. The Reasons Claimed for Termination

The nub of plaintiffs' action before this Court is the justification given by DOS for its termination of them. On its motion, DOS reiterates that its decision to terminate plaintiffs was based on their misconduct, which had been exposed by a detailed investigation undertaken in 2000. Plaintiffs paint a much different picture, contending that their termination was merely the final step in a targeted scheme of harassment and retaliation on the part of DOS.

#### a. The DOS Perspective

DOS argues that the reasons for termination—theft of services and corruption—are crystal clear and that it had ample evidence to support plaintiffs' guilt. The DOS chief investigator, Robert Zafonte ("Zafonte") averred that the town's investigation began when John Sandrowicz ("Sandrowicz"), the supervisor in charge of Code Enforcement, was informed by the Nassau County Health Department that one of Ockimey's neighbors had complained about a landscaper depositing bags of waste at 1034 Rochelle Court. The bags, the complainant claimed, were then collected by a DOS pick-up truck. (Jacobs Aff. at Ex. D). The landscaper also allegedly told the complaining neighbor that a DOS employee owned 1034 Rochelle Court and was being paid by him for allowing the dumping and collecting of the waste. (Id.)

Upon learning of this complaint, Sandorwicz notified the Commissioner of DOS, Richard T. Rohan. Rohan directed Hempstead's attorneys to pursue the matter. At that point, Zafonte took over the investigation. Zafonte asserts that he began surveilling Ockimey's premises on May 10, 2000. (Id. at ¶ 7). He claims to have witnessed a van towing a trailer park at 1034 Rochelle Court and the driver of the van deposit approximately 65 bags on the driveway. (Id. at ¶ 8). Zafonte further avers that the driver then left the van and trailer at 1034 Rochelle Court and walked around the corner, entering a home at 1022 Jerusalem Avenue. Following the driver's

6

departure, Zafonte claims then to have opened "most" of the bags and discovered grass clippings. The license plates for the van and trailer were registered to Rodney Davis, a landscaper who allegedly was Ockimey's childhood friend.

Zafonte returned to the property the following morning, where, he says, he witnessed Ockimey and Fowler load 35 of the bags into a DOS pick-up truck. Zafonte declared that he then followed the plaintiffs in the DOS pick-up truck to the Hempstead landfill, where plaintiffs dumped all 35 bags of waste. Zafonte asserts that he continued his surveillance into June of 2000 and that he observed the landscaper and plaintiffs repeat this process many times over during that period.

Alan Lapp, a superintendent of DOS in charge of issuing permits for rubbish and landscaping debris handling, explained the DOS rate structure for dumping at the Hempstead landfill. Lapp declared that, when a vehicle enters the Hempstead landfill (located in Merrick), it passes over a scale, generating a weight ticket that classifies the type of debris and specifies total weight. All town residents are permitted to use the Hempstead landfill, but are required to pay an appropriate fee ("dumping fees") which for landscapers is set at $45/ton of grass clippings and $96/ton of debris. DOS vehicles are also required to pass over these scales and generate weight tickets. DOS vehicles have permits assigned to them, which, when displayed, excuses the payment of dumping fees. Nonetheless, as defendant Stanley Lombardo testified, Maffei was empowered to otherwise waive dumping fees and did so on occasion. On another score, Lombardo also testified that, on a few occasions, he had noticed plaintiffs appear at the landfill with a suspiciously weighty amount of debris, given the work tickets they had been assigned.

Finally, and more to the point, the DOS supervisors uniformly denied that they had ever given plaintiffs permission to collect grass clippings and yard waste from Ockimey's home and

7

dump it in the Hempstead landfill without charge. Lombardo acknowledged in his testimony, however, that he was aware that Maffei had given Ockimey permission to retrieve debris from a renovation of 1034 Rochelle Street, but never grass clippings or yard waste.[7] Francesca Capitano ("Capitano"), Hempstead's lead counsel, concurs that Maffei gave permission for collecting renovation debris and also testified that this permission was given sometime in 2000. Therefore, DOS argues, plaintiffs never received permission to collect the grass clippings alleged by Zafonte to have been deposited at and collected from 1034 Rochelle Court. Whether such an exception to the rules could have been lawfully authorized, DOS argues, is irrelevant since it alleges permission was not given and, consequently, plaintiffs conduct was wrongful and their termination justified.

### b. As Told By Plaintiffs

Naturally, plaintiffs vehemently disagree. The justification proffered by DOS, they say, is nothing more than a pretext. They contend that they never collected and dumped grass clippings on behalf of a landscaper and that the only times they ever used DOS vehicles to collect debris from 1034 Rochelle Court, they were authorized to do so by their supervisors.[8] The real story, plaintiffs argue, is that they had long been the target of racial slurs and a discriminatory work environment and that their termination was based on racial animus and in retaliation for testimony given by Ockimey in a sexual harassment suit against a DOS employee.

Denying that they were collecting grass clippings from 1034 Rochelle Court, Ockimey

---

[7] As Maffei has passed away, he was not deposed in this action.
[8] There is certainly a factual dispute as to whether plaintiffs operated an "illegal transfer station", or only dumped debris with permission. However, given that the Court concludes that plaintiffs otherwise have failed to sustain their prima facie burden for their retaliation claims, the need for defendants to articulate a justification is obviated and the fact dispute about the transfer station operation rendered immaterial. Put another way, assuming, as plaintiffs say, that they did not operate an "illegal transfer station", it would not save their retaliation claims. See generally, Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005) (describing burden shifting under Title VII); Reuland v. Hynes, 460 F.3d 409, 415 (2d Cir. 2006) (describing burden shifting for a First Amendment § 1983 retaliation claim).

and Fowler do acknowledge that they did collect debris associated with a renovation of Ockimey's house at that location, which allegedly began in 1999 and continued through 2000. They further assert that each time they visited 1034 Rochelle Court, they did so with permission from Maffei. Moreover, they contend that special collection runs at DOS employees' homes and those of their friends and relatives were routine and rarely caused a stir.

These "favors", as Ockimey testified they were characterized, were allegedly performed for all ranks of DOS supervisors. First, Ockimey specifically recalled an occasion when he, Miller and Malitrano, who did not recall the incident, collected boxes and tree branches from Maffei's daughter's home. Similarly, Fowler testified that he and Maffei removed yard waste and debris from Maffei's house at least twice, neither time with a work ticket. Both plaintiffs also testified about collection visits to a vacant lot adjoining a gas station owned by one of Lombardo's friends in 2000 and 2001 to pick up wood and oil. (Lombardo concedes that material was collected from a lot next to his friend's gas station, but would not confirm that this waste was generated by the gas station.) Plaintiffs further assert, and defendant Steven Pepe concedes, that they were sent to Pepe's mother's home on multiple occasions to collect debris sometime in 2000 or 2001, and that the debris was dumped without payment of dumping fees. Lastly, plaintiffs were also allegedly dispatched to collect debris from Superintendent Ernie Pastor's mother's home on multiple occasions.

The pattern and practice of these "favors", plaintiffs argue, belie the furor asserted by DOS over their alleged collection of debris from 1034 Rochelle Court. Instead, they argue that these "favors" demonstrate that DOS terminated plaintiffs to "get even" with them—indeed, they assert that, in 2002, Zafonte himself told Delewin that "Ed [Conforti Jr.] and Ockimey were pieces of shit and they were no good" and that "four people from the [t]own were getting fixed,"

9

including Ockimey and that "#1 was Ed Conforti [Jr.]." (Brewington Aff. at Ex. Q). As to why they would harbor animosity towards them, plaintiffs offer two reasons: racial animus and retaliation.

### i. Allegations of Racial Animus

Plaintiffs argue that racial animus in the workplace was displayed and directed towards them through racial slurs, unequal overtime assignment and uneven promotion tracks. According to plaintiffs, this racism eventually culminated in their terminations.

Plaintiffs specifically allege that DOS employees, particularly Maffei and Malitrano, frequently made racially-charged comments. Ockimey testified that Malitrano referred to Fowler and him as "assholes" or "stupid", and that once, while the two were cutting down a tree in Malitrano's back yard, Malitrano referred to Ockimey as a "stupid nigger". Ockimey testified that another employee was present at the time and heard the comment. Fowler also testified that Malitrano referred to him as a "stupid asshole nigger" at the office and jobsite, but asserted that only Ockimey heard these comments. Fowler also indicated that he was once called a "stupid nigger" by Lombardo, an allegation denied by Lombardo. The plaintiffs were unable to date any of these comments.

Additionally, both Ockimey and Fowler contend that Maffei frequently used similarly distasteful and racially offensive language. Plaintiffs testified that Maffei referred to them, and to Delewin as well, as "assholes" and "stupid" many times. Malitrano acknowledged in his deposition that Maffei had made these types of comments, but had thought Maffei was "joking." Furthermore, Ockimey testified that Maffei once told Ockimey that he liked his coffee "black like [he] liked his women." (Ockimey Tr. 148:9-22). There were apparently numerous witnesses to this event, including Malitrano, who conceded at his deposition that he overheard

10

Maffei make this statement. Neither Ockimey nor Fowler could date this comment, but Capitano testified, based on her personal knowledge as the town's counsel in such matters, that it occurred sometime in 1996 or 1997.[9]

Ockimey and Fowler testified that they spoke with supervisors about these comments, but that nothing was done. Plaintiffs acknowledge, however, that at some point before 2002, they met with Superintendent Pastor and Malitrano concerning Malitrano's comments. According to Fowler, Malitrano desisted for a few months, but then started making inappropriate jokes again. Fowler also testified that he complained to Maffei about his comments, but that Maffei also persisted. Further, Fowler described an incident where he sought to speak to Pastor about these incidents, but was discouraged from doing so by Maffei. When Fowler eventually did speak to Pastor, Fowler alleges Maffei interrupted their conversation in a huff and insisted that Fowler should have spoken to him first. Fowler asserts that after this meeting with Pastor, he went to speak with Sais, who told him that he would discuss the matter with DOS officials. Finally, Fowler testified that he also briefly discussed his complaints with Hempstead Councilwoman Dorothy L. Goosby, but that nothing came of this discussion.

For their part, DOS supervisors are ambiguous as to whether they knew of these complaints. Pepe testified that he had heard rumblings about allegations of discrimination and that he "may" have met with Ockimey about them. Malitrano recalled racial epithets being used by DOS employees of all races, but did not recall anyone expressing offense at these comments. Capitano testified that she discussed some of plaintiffs' allegations with Maffei and Pastor, but that both men said that they had never been approached with any complaints. In the end, it is undisputed that no disciplinary action was taken based on the allegations plaintiffs make here.

---

[9] ALJ Vespoli, in ruling on Ockimey's second SDHR complaint, found that this comment was made around September 1996.

Plaintiffs also accuse DOS supervisors with having awarded overtime and promotions disproportionately to white employees. Plaintiffs offer a sweeping indictment that, in the period from the 1990s through their termination, black employees received less overtime—"on average....eight hours/pay period"—than white employees, who allegedly received 16 hours of overtime during a pay period, and that they themselves were denied overtime over this period. (Ockimey Decl. at ¶ 55). Ockimey also claims that, as a seasonal worker, he would ask Pepe for overtime, but was told that seasonal workers could not receive overtime. (Id. at ¶ 55). Nonetheless, Ockimey says Richard Birch ("Birch") and Jack Kilkenney ("Kilkenney"), white employees, received overtime as seasonal employees. Plaintiffs provide no further evidentiary specification of this claim.

In response, defendants deny that there was racial motivation for any overtime disparity, should such disparity exist, and note that from August through November 2002, Kilkenney received 9.6 hours of overtime for each two-week pay period, while Cook, a black employee received 16 hours for each two-week pay period. (Ind. Def. Rule 56.1 Stmt at ¶¶ 52-55). Moreover, they proffer that, although Ockimey received no overtime during that period, Fowler averaged 4.5 hours of overtime during it. (Id.) Defendants contend, moreover, that their actual overtime policy did not exclude seasonal employees but gave preference to full-time employees, who were offered overtime first, followed then by seasonal workers.

Plaintiffs' complaints concerning their inability to receive promotions similarly lack specification. Ockimey contends that he worked as a "seasonal employee" for almost nine years before becoming a full time employee.[10] (Ockimey Decl. at ¶ 36). For his part, Fowler contends that he had to wait four years from 1995 to 1999. (Fowler Decl. at ¶ 2). Both claim that some

---

[10] As discussed above, Ockimey worked on and off as a seasonal employee from 1988 to 1997, but spent some time away from DOS during that period.

white employees, including but not limited to Kilkenney, received such a promotion within only one year. (Fowler Decl. at ¶ 2; Ockimey Decl. at ¶ 38). Fowler further contends that he asked for promotions on numerous occasions, but was always rebuffed because he did not have a CDL, even though there were positions that did not require a CDL. (Fowler Decl. at ¶ 29).

Defendants counter with employment records which demonstrate that Kilkenney was hired on August 30, 1999 as a seasonal worker and promoted nearly three years later on April 22, 2002. (Ind. Def. Rule 56.1 Stmt. at ¶ 51). Similarly, defendants document that Cook was hired as a seasonal employee on July 29, 1999 and was hired full-time on May 8, 2002. (Id. at ¶ 53). With respect to Ockimey, defendants also argue that Ockimey himself hampered his promotion efforts by allegedly reporting for work drunk and for purportedly threatening Lombardo's life. Finally, defendants contend that the promotions desired by plaintiffs all required a CDL, and that plaintiffs were informed of this fact on a number of occasions, but still chose not to obtain the CDLs, it is unchallenged, that they lacked.

ii. Retaliation

Plaintiffs interpose a claim in another count that their terminations were retaliatory. The parties' factual allegations concerning this charge are like two cargo-less ships passing in the night many hundreds of miles apart. Plaintiffs allege that Ockimey testified in an SDHR hearing concerning allegations of sexual harassment against Conforti Jr. but do not provide a date for that testimony. (Ockimey Decl. at ¶ 28). Conforti Jr. is Malitrano's nephew and son of Edward Conforti Sr., another DOS supervisor. Ockimey avers that DOS terminated plaintiffs "[s]hortly after [SDHR] rendered its decision in that matter against Mr. Conforti Jr" in September 2002. (Ockimey Decl. at ¶ 29). Plaintiffs also offer a statement by Delewin, dated January 9, 2003, describing two incidents involving Zafonte. In the first, Delewin alleges that around October or

13

November of 2002, Zafonte told Delewin and another male that Ockimey and Fowler were "pieces of shit and they were no good." (Brewington Aff. at Ex. Q). In the second, which allegedly occurred in June 2002, Zafonte stated that Ockimey had received a DWI citation and that the town would "fix him."

DOS asserts that Conforti Jr., its employee, was never the subject of any type of job-related discrimination complaint. Instead, Capitano, based on her personal knowledge as the town's attorney, avers that Ockimey testified on behalf of Delewin in a sexual harassment suit filed around November 1996. (Capitano Aff. at ¶ 5). Putting aside the tit for tat about who testified for whom about what, most critically, and plaintiffs do not challenge it, Ockimey's Delewin-related SDHR testimony was given in 1996 and 1997. The SDHR issued its decision in Delewin's case around August or September 2002.

## Discussion

### I. Standard for Summary Judgment

A motion for summary judgment must be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, (1986). The Court's responsibility in assessing the merits of a summary judgment motion is thus not to try issues of fact, but rather to "determine whether there *are* issues of fact to be tried." Sutera v. Schering Corp., 73 F.3d 13, 16 (2d Cir. 1995) (quoting Katz v. Goodyear Tire & Rubber Co., 737 F.2d 238, 244 (2d Cir. 1984)). In deciding such motions, the moving party bears the burden of demonstrating that there is no genuine issue as to any material fact, see, e.g., Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005), and the evidence presented will

14

be construed liberally in favor of the party opposing the motion, see, e.g., Sec. Ins. Co. of

Hartford v. Old Dominion Freight Line. Inc., 391 F.3d 77, 83 (2d Cir. 2004).

Once the moving party has met its initial burden of demonstrating the absence of a

disputed issue of material fact, the burden then shifts to the nonmoving party to present "specific

facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The nonmoving party

may not then rely solely on "conclusory allegations or unsubstantiated speculation" in order to

defeat a motion for summary judgment. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).

Thus, if the evidence favoring the nonmoving party is "merely colorable . . . or is not

significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 249-50 (1986).

## II. Defendants' Motions

### A. Count I: Title VII

Plaintiffs' first count alleges violations of Title VII, 42 U.S.C. § 2000(e), against

Hempstead and DOS based on (1) the alleged failure to promote and (2) the improper

termination of plaintiffs. Title VII requires a plaintiff to file a charge of discrimination with the

Equal Employment Opportunity Commission within 300 days of the alleged discriminatory act if

they have filed a similar charge with a state agency empowered to grant relief from

discriminatory practices. See McPherson v. N.Y. City Dep't of Educ., 457 F.3d 211, 213 (2d

Cir. 2006). Having filed such a charge, a plaintiff must then wait until either a "right-to-sue"

letter has been received or 180 days have passed since the filing of the charge. Id. Once the

claimant has received a right-to-sue letter or the 180 days elapse, the claimant must bring suit

within 90 days. Id.

Here, according to the complaint, Ockimey filed a charge with SDHR and EEOC on

January 7, 2003, and received a right-to-sue letter on May 13, 2005.[11] (Compl. at ¶¶ 6-7). Fowler filed his charge with SDHR and EEOC on January 14, 2003 and received a right-to-sue letter also on May 13, 2005. (Id. at ¶¶ 9-10). Therefore, working backwards, it appears that the earliest alleged discrimination which plaintiffs could challenge under Title VII would have to have occurred on or after January 7, 2002 for Ockimey and January 14, 2002 for Fowler. While there is no dispute that plaintiffs' alleged retaliatory terminations fall within those bounds, their failure-to-promote claims do not.

Even if timely, though, plaintiffs' allegations concerning defendants' failure to promote them are hazy at best and clearly insufficient. In order to prevail on a Title VII failure to promote claim, plaintiffs must "allege that [they] applied for a specific position or positions and [were] rejected there from, rather than merely asserting that on several occasions she or he generally requested promotion." Brown v. Coach Stores, 163 F.3d 706, 710 (2d Cir. 1998). Furthermore, as defendants note, all of the specific allegations plaintiffs make with respect to their requests for promotion concern their promotion to full-time laborers, which actually occurred in 1997, well before the limitations period. (See, e.g., Fowler Decl. at ¶ 2). Within the limitations period, there is no evidence in the record that plaintiffs applied for any specific position, let alone were rejected, and thus, no evidence whatsoever supporting an essential element of their claims.

All that plaintiffs offer in rebuttal are the type of general allegations dismissed in Brown. First comes Fowler's averment that "there were several positions that I could have advanced to, including Laborer II. *Yet no such positions were offered to me.*" (Id. at ¶ 29) (emphasis added). Stated differently, there is no evidence proffered at all that Fowler ever *applied* for any of these

---

[11] Defendants do not challenge the dates that either Ockimey or Fowler filed their charges with EEOC or the dates they received their right to sue letters.

positions. Nor does Fowler offer evidence that he had a CDL, which the town claims was a requirement for promotion, or, alternatively, any proof that there were promotional opportunities available that did not require a CDL. Ockimey, on the other hand, focuses primarily on DOS's alleged tardiness in promoting him to full-time status, but also avers that during his employment there were no black foremen, contrary to the defendants' assertions, and that there was a disproportionate number of black seasonal workers. (Ockimey Decl. at ¶¶ 52-53). What is lacking, however, is any connection between these charges (even if true) and an actionable harm Ockimey is alleged to have suffered. This is so because, failing the <u>Brown</u> test, Ockimey proffers no evidence of what, if any, positions he applied for, much less when he may have applied, and how he was otherwise qualified.

Plaintiffs argue that they are entitled to invoke the "continuing violations" doctrine to attempt to claw back time for their allegations concerning the alleged tardiness in promoting them to full-time status. Under this doctrine, a plaintiff is entitled to challenge discriminatory conduct falling outside the statute of limitations where "there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." <u>Cornwell v. Robinson</u>, 23 F.3d 694, 703 (2d Cir. 1994). Plaintiffs contend that their allegations of a discriminatory policy concerning overtime assignments constitutes such a continuing pattern of violation as to warrant invocation of the doctrine.

All that is missing is probative evidence to create a dispute putting material facts in issue. Plaintiffs offer Ockimey's naked charge that black DOS employees were awarded only eight hours of overtime per two-week pay period on average as compared to 16 hours for white employees. That is not enough. "Affidavits submitted in support of or in opposition to the

summary judgment motion must 'be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and *shall show affirmatively that the affiant is competent to testify to the matters stated therein.*'" See Patterson v. County of Oneida, 375 F.3d 206, 220 (2d Cir. 2004) (quoting Fed. R. Civ. P. 56(e)) (emphasis added). Simply put, the Court has been left in the dark as to how Ockimey claims personal knowledge of all overtime assignment patterns at DOS over the course of a decade; it is certainly not revealed in his affidavit or other moving papers. Nor need such statistical claims be left to one declarant's recollection. Public employee records must be kept by town officials, and indeed the town has submitted employee records for other employees in support of its motion. Yet, despite such discoverable records, plaintiffs have not cited any deposition testimony or documentary evidence supporting this allegation. Nor do they even claim they sought to discover such information and were rebuffed. Ockimey does offer his recollection that "he would be sent to see Mr. Pepe" about overtime, but was told that seasonal employees could not get overtime. Yet, since Ockimey admits he was promoted to full-time status in 1997, even assuming the accuracy of what he claims, he offers no recollection about overtime denials after his promotion. Put another way, even crediting Pepe's reliance on Ockimey's seasonal status to deny overtime as a pretext for discrimination, Ockimey offers no evidence of any similar incidents occurring between 1997 and the beginning of the limitations period in 2002, thus creating significant gaps in the chain of alleged discrimination. Such gaps defeat invocation of the continuing violations doctrine.[12] See Weeks v. New York, 273 F.3d 76, 84 (2d Cir. 2001) ("Absent unusual circumstances, a two-year gap is a discontinuity that defeats use of the continuing violation exception.").

---

[12] To the extent plaintiffs' arguments may also be construed to include allegations of a hostile work environment, these are unavailing in invoking the doctrine. Here, the record only demonstrates one adverse act which falls within the statutory time period—plaintiffs' termination. The Second Circuit has categorically held that a termination that falls within the statutory time period is not sufficient grounds to "pull-in" a time-barred hostile work environment claim under the continuing violations doctrine. See Patterson, 375 F.3d at 220.

As a result, little remains of Count I. Certainly, one claim that survives the initial cut is Ockimey's claim of a retaliatory discharge on November 8, 2002, for which the Second Circuit has delineated an evaluative procedure. First, a plaintiff must establish a <u>prima facie</u> case by showing "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." <u>Jute</u>, 420 F.3d at 173 (internal citations omitted). As to this, a plaintiffs' burden to survive summary judgment has been described as <u>de minimis</u>— indeed, it is sufficient that the Court conclude that the "proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." <u>Id.</u> If the plaintiff bears this minimal burden, a presumption of retaliation arises, and the "the onus falls on the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action." <u>Id.</u> If defendants can provide a legitimate reason, then it is up to plaintiffs to demonstrate that the retaliatory motive was the substantial reason for their discharge. <u>Id.</u>

Ockimey fails at the first step. He does not sustain even this <u>de minimis</u> burden. To be sure, the fact that Ockimey testified against his employer on behalf of a fellow SDHR complainant qualifies as engaging in a protected activity. And there is no dispute, obviously, that defendants were aware of such testimony. Equally obvious, termination is an adverse employment activity. What Ockimey fails to do, however, is demonstrate the slightest causal relationship between any testimony he gave against his employer and his termination.

Ockimey's misperception is as obvious as the lack of record support for this claim. His argument essentially rests on two pieces of "evidence". The first is the timing of the termination in relation to the timing of his testimony. He is correct that timing is dispositive. But timing not only fails to support the claim of retaliatory discharge, it demolishes it. Admittedly, there is

some confusion over the precise timeline, but Ockimey ultimately does not challenge the assertion by defendants that he actually testified some time between 1996 and 1997 in a case involving Delewin.[13] Thus, the protected activity, which is the act of testifying itself, occurred approximately five years before he was terminated. Actions taken after such a long span do not suggest causality; they suggest precisely the opposite. <u>Clark County Sch. Dist. v. Breeden</u>, 532 U.S. 268, 273 (2001)(Retaliatory "[a]ctions taken (as here) 20 months later suggests, by itself, no causality at all."). As a consequence, the timing in this matter not only fails to support causation, it positively undercuts it.

The second piece of evidence upon which Ockimey relies is Delewin's statement that Zafonte had indicated that DOS and the town viewed Ockimey as a "piece of shit" and that they intended to "fix him." However, this statement is not competent evidence, for it is not sworn to, merely notarized. See <u>Sarno v. Douglas Elliman-Gibbons & Ives, Inc.</u>, 183 F.3d 155, 160 (2d Cir. 1999) (unsworn statement cannot be considered on motion for summary judgment). Moreover, even assuming *arguendo* that Delewin's statement is properly before the Court, it is not at all probative of the relevant question—whether Ockimey's termination was in retaliation for his participation in a protected activity. First off, assuming its truthfulness for purposes of the motion, the statement referenced a collective grudge against Ockimey, Conforti Jr. (who was also terminated by the town for allegedly operating an illegal transfer station) and other town

---

[13] Indeed, Ockimey takes no position on the timing of his testimony. Instead, he simply offers that the termination occurred shortly after the SDHR issued a decision. However, even assuming solely for the purpose of argument that the timing between when the SDHR decided Delewin's case and Ockimey's termination is relevant, Ockimey has not provided the Court with the resolution of the SDHR case. Thus, the Court remains in the dark as to what retaliatory motive the SDHR decision could be inferred to have engendered in his employer. It would be Ockimey's burden to make some minimal showing on this score to establish relevance and he makes no showing at all. (Ockimey cursorily alleges in his affidavit and brief that he gave testimony against Conforti Jr., but offers no further specification. Even assuming this scrap of evidence is sufficient to establish that this proceeding did exist, Ockimey does not provide the Court with any particulars concerning this alleged testimony, including its timing and nature. Nor are any particulars offered as to the respective roles of the parties in or the resolution of the alleged proceeding. In short, the reference to such a proceeding offers nil support for Ockimey's retaliation claim.)

employees. Furthermore, nothing in the statement mentions any reason for this alleged collective grudge, much less some impermissible retaliatory animus. Simply put, all Delewin's statement shows, at most, is that there was some animosity between the town and a few of its employees, including Ockimey. But, it fails to shed any light on the all important issue—the reason for that animosity. Thus, Ockimey's allegations stand naked, supported neither by the timing of his termination nor Delewin's statement, even had it been evidence competent for consideration in the motion. Ockimey, therefore, does not on this basis meet even his <u>de minimis</u> burden on the retaliatory discharge claim.

Finally, both plaintiffs also allege that their termination was racially motivated. A plaintiff bringing such a claim must show "1) that [he] belongs to a protected class; 2) that [he] was competent to perform the job or that [he] was performing [his] duties satisfactorily; 3) that [he] was discharged; and 4) that the discharge occurred under circumstances giving rise to an inference of discrimination." <u>Mario v. P & C Food Markets, Inc.</u>, 313 F.3d 758, 767 (2d Cir. 2002). Again, this is a <u>de minimis</u> burden. <u>See id.</u> And again, plaintiffs have failed to sustain it. While plaintiffs clearly meet the first three prongs, their discharge fails to create an inference of discrimination.

This is not to say that plaintiffs have not shown that there were racial comments made at various times by employees of DOS. However, setting aside their inability to even approximately date any of these comments, plaintiffs have failed to show <u>prima facie</u> that any discriminatory animus on the part of lower level supervisors at DOS played any role in the termination decision made by DOS administrators with the power to terminate their employment. In other words, although plaintiffs have adduced evidence to show that Malitrano, Maffei and Lombardo may have made racially disparaging comments, they have not made any showing

these defendants had any role in their termination. Moreover, the uncontradicted evidence affirmatively suggests that these defendants did not have any influence over the termination of plaintiffs' employment. Capitano testified that she drafted both termination notices, and that Maffei, Malitrano, and Lombardo played no role in the termination decision. (Capitano Tr. at 101:12-22). She further avers that Maffei was actually transferred to an entirely different department on December 3, 2001, nearly a year before plaintiffs were terminated. (Capitano Aff. at ¶ 12). Similarly, she testified that she was not aware of any of the "favors" performed for DOS supervisors until after plaintiffs were terminated. (Capitano Tr. at 56:14-58:7). Plaintiffs do not at all challenge defendants' proof, beyond reiterating that the men who made racial comments were supervisors. Though proof necessary to create an inference of discrimination need only be de minimis, it requires more than the mere allegation that some co-workers at a higher level (but with no responsibility for the adverse employment action) made such comments. Even assuming a hostile work environment in the trenches supervised by the alleged wrongdoers, there is absolutely no proof in the record that such racial animus climbed the corporate ladder at DOS to reach those who made the decision to terminate plaintiffs. This claim, accordingly, fails as well.

As a result, defendants' motions are granted with respect to Count I, and all claims it advances are hereby dismissed.

*B. Count II: 42 USC § 1981*

Plaintiffs' second count alleges that defendants' failure to promote them to full-time status and to various other unspecified positions violates 42 U.S.C. § 1981. (Compl. at ¶¶ 62-68). Hempstead first attacks these claims on timeliness grounds, asserting that the alleged failure to promote occurred outside of the statute of limitations. Further, even if plaintiffs' claims were

22

timely, defendants argue they still must be dismissed because plaintiffs have not provided sufficient evidence to warrant trial.

"[C]laims under 42 U.S.C. §§ 1981 and 1983 need not be asserted within the 180- or 300-day period applicable to Title VII claims. The statute of limitations applicable to claims brought under §§ 1981 and 1983 in New York is three years." Patterson, 375 F.3d at 220. Plaintiff filed their complaint on August 11, 2005. Thus, the conduct challenged under § 1981 must have occurred on or after August 11, 2002.

The paucity of evidence relating to any of plaintiffs' failure to promote allegations advanced on Count I equally plagues their advancement under a § 1981 theory. The only allegations regarding promotions which plaintiffs make concern a charged discriminatory "practice" in the promotion of workers from seasonal to full-time status. Even assuming that plaintiffs have offered sufficient credible evidence to support their contention that it was DOS's "practice to hire African American's as seasonal employees, and leave them in that position for years, without promoting them to full time status," plaintiffs themselves were promoted to full time status in 1997 and 1999. Therefore, any otherwise actionable delay in those promotions would clearly be untimely under § 1981. Further, plaintiffs fare no better within the limitations period, for they have failed to identify any specific positions they sought but were denied, much less how they qualified for those positions.

Lastly, plaintiffs again seek to revive their past claims for denial of promotions based on the continuous violation doctrine. However, plaintiffs still have not filled a critical gap in the record: plaintiffs have not provided a scintilla of evidence that, at any point after 1999, they ever applied for a *specific* position and were denied. Without such evidence, the length of time elapsed between 1999 and the beginning of the limitations period on August 11, 2002 is too great

to justify application of that doctrine under any circumstance. See Weeks, 273 F.3d at 84.

Defendants' motions are granted with respect to Count II, which is dismissed.

*C. Count III: 42 U.S.C. § 1983*

The third count alleges that defendants violated "[p]laintiffs' [First and Fourteenth Amendment] rights of free speech, free association, equal protection and due process." First, they argue that they had a property interest in a nondiscriminatory system of promotions and overtime opportunities, created by their collective bargaining agreement (the "CBA") and New York Civil Service Law § 61. Second, they allege equal protection and due process violations based on a discriminatory failure to promote and denial of overtime—stripping them of these property rights.

As to their property right argument, New York Civil Service Law § 61 does provide for promotions to competitive positions of the kind sought by plaintiffs upon completion of a civil service examination—*examinations which plaintiffs have not alleged they have ever taken much less passed.* See N.Y. Civ. Service Law § 61. Moreover, the New York Court of Appeals has plainly held that, notwithstanding the passing of an appropriate examination, § 61 does not create "any enforceable right or even any legally cognizable interest" in the promotion. See Andriola v. Ortiz, 82 N.Y.2d 320, 324; 604 N.Y.S.2d 530; 624 N.E.2d 667 (1993). Thus, § 61 does not create a property right that can be the subject of a § 1983 action. Similarly, plaintiffs have not identified any provision in the CBA which guarantees them a contractual right to such nondiscriminatory treatment. Indeed, the CBA's only mention of an anti-discrimination policy concerns discrimination "because of activities on behalf of the Union." (Jacobs Aff. Ex. C at 15). An action under § 1983 on this theory fails.

The equal protection claims are unsustainable as well. They run afoul of the three year

statute of limitations. See Patterson, 375 F.3d at 220. As already detailed, plaintiffs offer no

evidence to substantiate any discriminatory employment practices against them after 1999.

Caselaw would allow plaintiffs to offer evidence of alleged discriminatory conduct falling

outside the limitations period to bolster proof of a harm allegedly occurring within the limitations

period, but, the first and indispensable step is to show a timely claimed harm—denial of

promotion or of overtime occurring within the period of limitations. Since plaintiffs offer not a

speck of evidence of such a harm occurring after January 2002, their equal protection argument

is similarly without merit.

The same fate holds for their First Amendment arguments. Public employee First

Amendment retaliation claims require a four part analysis. The first step is to determine whether

the relevant speech was uttered pursuant to the employee's duties. See Reuland, 460 F.3d at 415.

Next, the Court must determine whether the speech was a matter of public concern. Id. If it is,

the adverse employment action can still be sustained if the employer can show the "speech is

reasonably likely to disrupt the effective functioning of the office, and the employee is fired to

prevent this disruption." Id. Finally, the employee must show "that the speech was a substantial

or motivating factor in the adverse action." Id.

Turning to Ockimey's specific allegations, he asserts that his testimony at SDHR against

the town was the "substantial motivation" behind his termination.[14] But, the gap between

Ockimey's testimony (at least the only testimony for which there is a date) and his termination is

approximately five years, a span which is fatal to his claim of causality between his protected

speech and his termination. See Espinal v. Goord et al., 554 F.3d 216, 228 (2d Cir. 2009)

---

[14] Ockimey's brief and affidavit make reference to testimony in a case involving Conforti Jr. Again, other than the scant, nonspecific mention in the brief and affidavit, there is absolutely no evidence that such a happening occurred. See n.13, supra. The town does concede, though, that Ockimey testified adversely in such a proceeding involving Delewin. It is assumed that it is this testimony to which Ockimey meant to refer.

25

(noting that a temporal relationship may be too attenuated to establish a causal relationship with respect to a First Amendment § 1983 claim); see also Deravin v. Kerik, No. 00-cv-7487, 2007 U.S. Dist. LEXIS 24696 (S.D.N.Y. Apr. 2, 2007) ("Time periods greater than one year have generally been rejected when offered to indirectly establish a causal connection between an act and its purported consequences."). Also unavailing is plaintiffs' reliance on Delewin's unsworn statement for it is not competent evidence; nor, even if competent, does it provide any basis upon which the existence of a constitutionally impermissible motive may be inferred. See Point II-A, supra. Consequently, Ockimey does not offer any probative evidence that his termination was "substantially motivated" by his testifying before SDHR, and this aspect of his § 1983 claim fails. See Washington v. County of Rockland et al., 373 F.3d 310, 321 (2d Cir. 2004).

Fowler does no better. He contends that his First Amendment rights were violated when DOS retaliated against him by placing him in a different department, ostensibly because he filed his 2003 complaint with SDHR. This allegation, however, does not advance an adverse employment action. An adverse employment action is one that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Uddin v. City of New York, No. 06-cv-2602, 2008 U.S. App. LEXIS 8783 (2d Cir. Apr. 23, 2008) (quoting Burlington Northern & Santa Fe Ry. v. White, 548 U.S. 53 (2006)). Here, Fowler alleges that while he was reinstated as "Laborer I", he was then assigned to recycling, where "[u]nlike his prior work, this work is extremely physical, involves a lot of strain on my back and shoulders, and has caused me injury." (Fowler Decl. at ¶ 32).

This allegation, standing alone, is insufficient. First, Fowler has not shown any economic harm, such as diminution of salary or overtime, from the transfer. See Boland v. Town of Newington, No. 07-cv-3310, 2008 U.S. App. LEXIS 25345 (2d Cir. Dec. 16, 2008) (considering

the lack of economic harm in applying the Burlington Northern test). Second, Fowler returned to DOS as Laborer I, which was the same position from which he was terminated. At bottom, all Fowler truly complains of is a change in job responsibilities—now, instead of clearing debris with Code Enforcement, he processes recycling with the recycling unit. The Court concludes that a reasonable employee would not feel dissuaded from filing a discrimination charge simply by being transferred from one physically taxing environmental unit to another, without change in town employee title classification, pay rate, overtime opportunities, seniority, or significant shift in job responsibilities. Accepting the differences as described by Fowler, the changes are de minimis as a matter of law. See e.g., Brown v. Paulson, 236 Fed. Appx. 654, 655 (2d Cir. 2007) (holding that a plaintiff failed to sustain their burden for improper discharge where he did not demonstrate, *inter alia*, that the employment action "did not affect his salary, benefits, title, or essential job responsibilities."); see also Zelnik v. Fashion Inst. of Tech., 464 F.3d 217, 228 (2d Cir. 2006) (holding that deprivations of larger office space, prestige, access to facilities and use of a phone line are de minimis effects of an employment action).

Therefore, as to both plaintiffs, Count III is dismissed.[15]

*D. Count V: 42 U.S.C. 1985(3)*

Count V alleges under 42 U.S.C. § 1985(3) defendants conspired to violate unidentified "civil rights". (See Compl. at ¶ 81). "[I]n order to state a claim under § 1985(3) a complaint must allege, *inter alia*, that the defendants who allegedly conspired sought, with discriminatory intent, to deprive the plaintiff of a right covered by the Constitution or other laws." Spencer v.

---

[15] Having concluded that plaintiffs' § 1983 claims against the individual defendants must fall, the Court need not tarry long on plaintiffs' arguments regarding Hempstead's liability. "Simply put, if a claim fails as to the individual defendants because there was no violation of the plaintiff's constitutional rights, then it necessarily fails as to the municipality as well." Clubside Inc. v. Valentin, 468 F.3d 144, 161 (2d Cir. 2006). Here the Court has found no liability for constitutional violations on the part of the individual defendants—therefore, there can be no constitutional liability for Hempstead either, and Count IV must be dismissed. See Grennan v. Nassau County et al., No. 04-cv-2158, 2007 U.S. Dist. LEXIS 23087, at *50 (E.D.N.Y. March 29, 2007).

Casavilla, 903 F.2d 171, 174 (2d Cir. 1990). "[D]eprivation of a right created by Title VII cannot be the basis for a cause of action under § 1985 (3)." Great Amer. Fed. Savings & Loan Ass'n et al. v. Novotny, 442 U.S. 366, 377 (1979).

The gravamen of this count is that the town violated the civil rights of Ockimey and Fowler through their (a) intentional actions, patterns and practices based on race; (b) failure to take any steps to reverse or cure the wrongs which resulted in a scheme to "discriminate, humiliate and change the conditions of their employment", and (c) conspiracy "to have [p]laintiffs terminated because of their race and color." (Id. at ¶¶ 84-85). Missing altogether is any allegation that defendants violated any right of plaintiffs actually founded in the Constitution. In fact, the complaint appears to allege only civil rights recognized in Title VII— freedom from discriminatory employment practices—as the basis for this § 1985(3) claim.

Plaintiffs' opposition papers are not helpful, mentioning § 1985(3) only twice—once in the table of authorities and once in the preliminary statement but never in argument. The only reference to § 1985(3) approaching substantiality is the conclusory statement that plaintiffs have demonstrated enough evidence "to substantiate their claims of racially-based discrimination and retaliation for voicing opposition to discriminatory practices in violation of 42 U.S.C. Sections 1981, 1983, 1985, and 42 U.S.C. 2000(e)(Title VII), the New York State Human Rights Law (N.Y. Exec. Law Section 296, et seq.), and breach of contract." (Pl. Opp. at 8). None of it satisfies the obligation to identify and allege facts to show some independent violation of a constitutional right. The failure here is not a matter of factual development. All that plaintiffs allege are violations of Title VII rights and that is legally insufficient. See Novotny, 442 U.S. at 377. Plaintiffs, in short, fail to state a claim under § 1985(3), and therefore, the Court dismisses Count V. See e.g., First Fin. Ins. Co. v. Allstate Interior Demolition Corp. et al., 193 F.3d 109,

115 (2d Cir. 1999).

*E. Count VI: N.Y. Exec. Law § 296*

"Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Fed. R. Civ. P. 12(h)(3). "Defects in subject matter jurisdiction cannot be waived and may be raised at any time during the proceedings." Fox v. Board of Trustees of the State Univ., 42 F.3d 135, 140 (2d Cir. 1994). The parties' papers have alerted the Court that it lacks subject matter jurisdiction over plaintiffs' claims under N.Y. Exec. Law § 296. As a result, Count VI of plaintiffs' complaint must also be dismissed.

N.Y. Exec. Law § 297 provides:

> No person who has initiated any action in a court of competent jurisdiction or who has an action pending before any administrative agency under any other law of the state based upon an act which would be an unlawful discriminatory practice under this article, may file a complaint with respect to the same grievance under this section or under section two hundred ninety-six-a of this article.

See N.Y. Exec. Law § 297(9). New York's statutory cause of action is, in essence, a one bite rule. A resort to judicial action is precluded where the claimant has filed a complaint regarding the same discrimination with SDHR. See Moodie v. Fed. Bank of Reserve, 58 F.3d 879, 882-84 (1995) (discussing Emil v. Dewey, 49 N.Y.2d 968, 428 N.Y.S.2d 887, 406 N.E.2d 744 (1980)). The rule is jurisdictional in nature, and its only exception is where the prior agency complaint is dismissed for "administrative convenience". Moodie, 58 F.3d at 882-84. The New York Court of Appeals decision stripping state courts of jurisdiction to hear such a cause of action, equally divests federal courts of jurisdiction. Id. at 884.

Here, plaintiffs have each filed complaints with SDHR concerning their termination along with allegations of discrimination. Those complaints clearly allege the same conduct challenged

in this proceeding.[16]  Accordingly, plaintiffs are foreclosed by § 297 from bringing § 296 claims concerning these same allegations.

### F. Count VII: Breach of Contract

In their seventh count, plaintiffs allege breach of contract actions against the town predicated on alleged breaches of (1) the CBA and (2) the settlement agreement disposing of Fowler's SDHR complaint.  Defendants attack this claim as (1) time-barred due to failure to comply with statutory notice provisions and (2) unfounded.  Plaintiffs do not challenge that they failed to file the requisite notice but argue that the Court should overlook this failure because the purposes of the notice statute have been fulfilled.

New York law mandates that no breach of contract claim can be properly commenced against a town unless a notice of claim is filed pursuant to Town Law § 65(3).  Section 65(3) requires filing of the notice of claim within six months after the claim accrues.  See Town Law § 65(3).  Ockimey alleges that the town breached the CBA when it terminated him on November 8, 2002.  Fowler claims this same breach of the CBA with respect to his termination on November 8, 2002, but further asserts that the town also breached the settlement agreement around August 22, 2003, by reinstating him to a different environmental unit.  Under New York law, a breach of contract claim accrues when the breach occurs.  Philippines v. Pimentel, 128 S. Ct. 2180, 2191 (2008) (citing Ely-Cruikshank Co. v. Bank of Montreal, 81 N.Y.2d 399, 402; 599 N.Y.S.2d 501; 615 N.E.2d 985, 986 (1993)).  Thus, in order to be timely, Ockimey would have had to have filed his notice of claim by May 2003 and Fowler by February 2004.  Both plaintiffs failed to do so

---

[16] It is of no moment that Fowler withdrew his SDHR complaint pursuant to the settlement.  In Emil, the plaintiff had similarly withdrawn his SDHR complaint, but the New York Court of Appeals still concluded that he was barred from proceeding under § 296 because he had failed, as Fowler does, to make any showing that the SDHR dismissed his complaint for "administrative convenience".  See Emil, 49 N.Y.2d at 969; 428 N.Y.S.2d at 887; 406 N.E.2d at 745.  With respect to Ockimey, there is only a showing that the SDHR complaint was filed (precluding a judicial action), but no showing regarding its disposition.

and neither disputes it.

Nevertheless, plaintiffs ask the Court to disregard their default because the town was allegedly put on notice of their breach of contract claim by their SDHR complaints, filed in 2003. New York law is to the contrary. "The service of a verified complaint is not equivalent to service of a verified notice of claim for the purpose of satisfying the claim-filing requirement of Town Law § 65 (3)." See Hassett-Belfer Senior Hous., LLC v. Town of N. Hempstead, 270 A.D.2d 307; 705 N.Y.S.2d 61 (2d Dep't 2000). Nor is the town estopped from asserting the defense even if the SDHR complaints are deemed to have put them on substantive notice. Cf. Gorman v. Town of Huntington, 12 N.Y.3d 275; ----N.E.2d---; No. 43, 2009 WL 909717 (2009). Plaintiffs have failed to comply with a condition precedent of bringing a breach of contract claim against Hempstead, and, therefore, these claims must be dismissed.[17]

*G. Count VIII—N.Y. Civil Rights Law § 40-c*

Plaintiffs' last count is brought under N.Y. Civil Rights Law § 40-c, which guarantees equal protection under the law and prohibits, *inter alia*, race-based discrimination. Defendants attack this claim on two grounds: first, that plaintiffs failed to file the requisite notice with the New York Attorney General pursuant to N.Y. Civil Rights Law § 40-d and second, that plaintiffs have failed to produce any evidence supporting their claims. Plaintiffs do not respond to either argument.

---

[17] The Court notes that the CBA contains detailed grievance procedures for the resolution of allegedly improper discipline (including termination), which is described by the CBA as the exclusive remedy for CSEA union members to challenge discipline imposed. (See Brewington Aff. Ex. M at Sched. E, ¶ 1.0). The terms of this contractual provision call for a step grievance procedure which culminates in judicial review that "shall be exclusively limited to procedures available under C.P.L.R. Article 75." (Id. at ¶ 9.5(c)). There is no record evidence that Ockimey finally grieved his termination or that Fowler has grieved his reassignment. "As a general proposition, when an employer and a union enter into a collective bargaining agreement that creates a grievance procedure, an employee subject to the agreement may not sue the employer directly for breach of that agreement but must proceed, through the union, in accordance with the contract." Board of Education v. Ambach, 70 N.Y.2d 501, 508; 517 N.E.2d 509; 522 N.Y.S.2d 831 (1987); Cf. 14 Penn Plaza LLC v. Pyett, --- U.S. ---, 129 S. Ct. 1456 (2009) (holding that a claim under the Age Discrimination in Employment Act must be submitted to arbitration in accordance with a collective bargaining agreements dispute resolution procedure). On this basis too, plaintiffs' claims related to alleged breaches of the CBA are not justiciable in an action on contract.

31

Under § 40-d, a party aggrieved under § 40-c must file a notice of his claim with the New York Attorney General "at or before commencement of the action." See N.Y. Civil Rights Law § 40-d. Failure to follow this statutory requirement mandates dismissal of the claim. See e.g., Chun Suk Bak v. Flynn Meyer Sunnyside, Inc., et al., 285 A.D.2d 523; 727 N.Y.S.2d 656 (2d Dep't 2001); Giaimo & Vreeburg v. Smith, 192 A.D.2d 41; 599 N.Y.S.2d 841 (2d Dep't 1993); Silver v. Equitable Life Assurance Co., 168 A.D.2d 367; 563 N.Y.S.2d 78 (1st Dep't 1990). Given the absence of opposition and of anything in the record that suggests that plaintiffs complied with this procedural requirement, the Count VIII claims under § 40-c must also be dismissed.

## Conclusion

For all the foregoing reasons, the motions of defendants for summary judgment must be, and hereby are, granted. The complaint is dismissed.

The Clerk of the Court is directed to enter judgment and to close the case.

SO ORDERED.

Dated:  Brooklyn, New York
        July 2, 2009


                                        ERIC N. VITALIANO
                                        United States District Judge


32